DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 INTRODUCTION {¶ 1} This case involves the legal custody of a young girl who was removed from her parents' care due to concerns about her home environment and parental supervision. P.L. was adjudicated neglected and dependent. Lorain County Children Services obtained temporary custody and placed P.L. with her half-brother and his wife. She remained there for over a year, adjusted well, and improved developmentally and academically. During that time, P.L.'s parents made some progress on their case plan, but the agency's concerns remained. Following a dispositional hearing, a magistrate awarded legal custody to P.L.'s *Page 2 
half-brother and his wife. P.L.'s father filed objections and amended objections to that decision. The trial court overruled those objections and granted the motion for legal custody to P.L.'s half-brother and his wife. Her father has appealed from that judgment. The central issue on appeal is whether it was in P.L.'s best interest to be placed in the legal custody of her half-brother and his wife rather than her parents. Upon consideration, this Court concludes that the trial court properly found that legal custody to the half-brother and his wife was in the child's best interest and the agency made reasonable efforts to prevent P.L.'s continued removal from her parents' home.
 FACTS {¶ 2} In August 2005, P.L. was removed from her parents' care due to Lorain County Children Services' concerns regarding the condition of her home and a general lack of supervision. At that time, P.L. was nearly three-and-a-half years old. She was living with her parents, a teenage half-sister, an adult half-brother, and his wife. According to the October 2005 Magistrate's Decision, Lorain County Children Services reported that P.L. had been living in a "filthy environment" including "piles of dirty dishes, food embedded in the carpet, trash throughout the home, and broken furniture." The family maintained up to nine cats that shared one litter box and spread feces throughout the house. P.L. slept in her parents' room because she did not have her own bedroom. According to reports received by Lorain County Children Services, P.L.'s parents "frequently *Page 3 
had sex in front of [her]." P.L.'s parents both have medical conditions that have resulted in them receiving government disability benefits. The family was struggling financially and was in danger of having their utilities disconnected.
 {¶ 3} P.L. was adjudicated neglected and dependent and temporary custody, with agency supervision, was awarded to P.L.'s half-brother, Bruce, and his wife, Katherine. P.L. remained in Bruce and Katherine's care for a year before Lorain County Children Services moved the court for an award of legal custody to the caregivers and termination of protective custody. A magistrate conducted a lengthy hearing on the motion before awarding legal custody to Bruce and Katherine and ordering visitation for P.L.'s parents. Both parents objected to the Magistrate's Decision. The trial court overruled the objections and granted the motion. Although both parents initially appealed that decision, only the father has set forth arguments for this Court to consider.
 {¶ 4} At the dispositional hearing, Tina Cottrell, a social worker employed by Lorain County Children Services, testified about the condition of the home and the ability of P.L.'s parents to supervise their daughter. Ms. Cottrell testified that, before P.L. was removed from the home, her personal hygiene had been a problem. Her hair was often dirty, her feet were blackened from failure to wear shoes, even outside of the house, and she often slept in "extremely soiled bed linens." P.L. had recurrent problems with lice and fleas. Ms. Cottrell also *Page 4 
testified that P.L.'s parents had not been regularly feeding or bathing their daughter.
 {¶ 5} According to Ms. Cottrell, P.L.'s parents were not attending to her medical needs. Prior to her removal, P.L. had never seen a dentist. Ms. Cottrell testified that P.L. had seven to eight cavities before the age of four, likely due to sugary drinks and neglected dental hygiene. Ms. Cottrell also testified that P.L.'s pediatrician expressed concern for P.L.'s respiratory system due to her "extensive exposure to cigarette smoke in the home" as well as her mother having smoked while pregnant with P.L. Ms. Cottrell testified that P.L. was a premature baby who has suffered "recurring upper respiratory infections that are chronically resurfacing" and that she is "at an increased risk for developing asthma." P.L.'s caregiver, Katherine, also testified that P.L. requires twice-daily breathing treatments and takes other prescription medications, including using an inhaler, for her respiratory problems. P.L.'s mother testified that she had tried to quit smoking, but was not successful. P.L.'s father testified that he did not actually believe that exposure to cigarette smoke was harmful to P.L.'s health, but he planned to designate a separate smoking room in the parents' house if P.L. came to live with them.
 {¶ 6} When P.L. was removed from her parents' care, she was developmentally and academically behind her peers. She was also shy and afraid to try new things. At three-and-a-half years old, P.L.'s speech was limited and *Page 5 
difficult to understand. Up until that time, P.L. was in the habit of pointing and making noise to get what she wanted. She suffered from fine and gross motor deficits and failed to meet developmental milestones regarding balance and coordination. Ms. Cottrell reported that a developmental evaluation reported that P.L.'s deficits were due to "lack of opportunity in her environment."
 {¶ 7} After filing for bankruptcy in Ohio, P.L.'s parents bought a house in West Virginia and began repairing and remodeling it. They moved there in April 2006, six months after P.L. was adjudicated neglected and dependent. P.L. remained in Ohio in the temporary custody of her half-brother, Bruce, and his wife, Katherine. Ms. Cottrell made regular visits to the West Virginia house, and P.L.'s guardian ad litem, Fred Courtright, also made two unannounced visits to West Virginia. Although the agency and the guardian ad litem originally had some concerns about the safety of the parents' new house, the parents made progress in addressing those issues and this concern was not included by the trial court in support of its grant of legal custody to Bruce and Katherine. The trial court did mention that the magistrate correctly found that another couple was living with the parents in their West Virginia home and occupying the bedroom intended for P.L. Various people testified that the couple would either sleep on the couch or move out of the house if P.L. were placed in the home.
 {¶ 8} P.L.'s parents have missed a significant number of scheduled visits with P.L. since she was removed from their care. According to the testimony of *Page 6 
Ms. Cottrell and Katherine, while the parents were living in Ohio, they missed more than half of their scheduled visits. After they moved to West Virginia, they never made a trip to Ohio for the sole purpose of visiting their daughter. They have traveled to Ohio to attend court appearances in this matter and have almost always included a visit with P.L. on those occasions. For about six months after they moved, the parents did not visit P.L. at all. Both parents testified that the cost of the five-hour-round-trip and difficulties communicating with the caregivers made more frequent visits impossible. Everyone agreed that the parents frequently spoke with their daughter by telephone.
 {¶ 9} Ms. Cottrell, Katherine, and Bruce all testified that, when the parents do visit their daughter, P.L.'s father makes little effort to interact with her. Her mother pays more attention to P.L., but has been inappropriate at times. Bruce and Katherine testified that, during one visit, in a Chuck E. Cheese restaurant full of children and families, P.L.'s mother lifted her shirt above the level of her bra in order to show off a new tattoo. Ms. Cottrell testified that, during visits, the parents have failed to wipe P.L.'s nose when necessary or wash her hands after taking her to the bathroom.
 {¶ 10} By the time the dispositional hearing was completed, P.L. had been living with Bruce and Katherine for over a year. By all accounts, P.L. had improved academically, socially, and emotionally during that time. Katherine testified that she had enrolled P.L. in preschool and had been working with her at *Page 7 
home to develop her language skills. Ms. Cottrell testified that Bruce and Katherine had established a daily routine for P.L., who seemed to function well in that environment. According to Ms. Cottrell, P.L. experienced "a lot of growth and development" after being placed with Bruce and Katherine. Her speech greatly improved, and she had become "quite a chatterbox." Although she struggled in preschool at first, by the time of the hearing, P.L. was easily making friends and participating in extra-curricular activities such as soccer and swimming. She had also begun to take great pride in her own personal hygiene and appearance. Ms. Cottrell testified that Bruce and Katherine were always attentive to P.L.'s needs and consistently followed through with the agency's recommendations.
 {¶ 11} Ms. Cottrell testified that the agency had developed a case plan for the family that required P.L.'s parents to provide for her basic as well as her special needs and to supervise those needs consistently. The case plan specifically required her parents to attend parenting classes and undergo mental health evaluations. After four referrals from Lorain County Children Services, the parents did complete the parenting classes. According to the parents, however, they were unable to integrate anything from those classes into their interaction with P.L. because the classes were focused on teenage behavior problems. By the time of the dispositional hearing, the parents had not completed mental health evaluations. They testified that they had tried to schedule them, but could not *Page 8 
overcome obstacles caused by confusion over how the sessions would be billed and scheduling difficulties caused by their move to West Virginia.
 {¶ 12} After the hearing, the trial court determined that it was in P.L.'s best interest for legal custody to be granted to Bruce and Katherine. The court granted the parents supervised visitation. The parents appealed.
 {¶ 13} P.L.'s father has argued that the trial court's order awarding legal custody to Bruce and Katherine was an abuse of discretion and against the manifest weight of the evidence. He has also raised two additional, distinct errors within his sole assignment of error. First, he has argued that the trial court violated his constitutional right to confront witnesses against him. Second, he has argued that the court incorrectly found that Lorain County Children Services had made reasonable efforts to place P.L. with her parents.
 BEST INTEREST OF THE CHILD {¶ 14} "Although the statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, this Court has previously indicated that the trial court must base such a decision on the best interest of the child." In re S.N., 9th Dist. No. 23571,2007-Ohio-2196, at ¶ 27 (citing In re S.J., 9th Dist. No. 23199,2006-Ohio-6381, at ¶ 32). The primary question at issue is whether it was in P.L.'s best interest to be placed in the legal custody of her half-brother and his wife rather than her parents. *Page 9 
 {¶ 15} The Magistrate held a lengthy dispositional hearing. Ms. Cottrell, the social worker assigned by Lorain County Children Services, testified extensively regarding information gathered about P.L., her parents, and her caregivers throughout the life of the case. The court also heard testimony from the guardian ad litem, each parent, Bruce, and Katherine, as well as from a friend of P.L.'s father. Although the evidence indicated that the parents had made some progress on their case plan and had addressed some of the agency's initial concerns, the parents had not completed their case plan objectives and were not prepared to provide a stable, healthy home for P.L. The social worker and the guardian ad litem testified that legal custody should be awarded to Bruce and Katherine rather than to P.L.'s parents.
 {¶ 16} Early in this case, the agency had been concerned about the failure of P.L.'s parents to attend to P.L.'s medical needs. At the dispositional hearing, the parents admitted that they had not located a doctor or dentist for P.L. near their new home in West Virginia. They also did not seem to understand the agency's concern regarding P.L.'s respiratory ailments. Ms. Cottrell and Katherine testified that P.L. took daily breathing treatments and other prescription medications due to her respiratory problems. There was evidence presented that all four people living in the parents' house in West Virginia habitually smoked cigarettes inside the house. The parents had not set aside a separate area of the house for smoking so that P.L. would not be exposed to second-hand smoke. Although the father did *Page 10 
claim he was willing to set aside such an area if P.L. were returned to his care, he also testified that he did not believe that exposure to second-hand smoke presented any threat to P.L.'s respiratory system.
 {¶ 17} The agency was also concerned about P.L.'s environment contributing to her delayed development of academic and social skills. When she was removed from her parents' care, P.L. was shy and barely verbal. At three-and-a-half years old, she was hardly intelligible when she did attempt to use language to express herself and she suffered from delays in the areas of gross and fine motor skills.
 {¶ 18} The agency was concerned that P.L.'s parents did not pay sufficient attention to her health and safety. While in her parents' care, her hygiene had been a major concern. During the course of this case, her parents' own personal hygiene was occasionally a concern and testimony revealed that P.L.'s parents did not always wipe her nose when necessary or wash her hands after taking her to the bathroom during supervised visits. Additionally, there was evidence that P.L.'s parents missed many of their weekly scheduled visits with P.L. while they were still living in Ohio. After the move, the parents visited her only when they were required to attend a court appearance. Significantly, various witnesses testified that P.L.'s father paid little attention to her during visits.
 {¶ 19} Further, the parents failed to meet the objectives of their case plan. Although they did complete parenting classes, by their own admission, they were *Page 11 
not able to integrate anything they learned into their parenting of P.L. Their case plan also called for mental health evaluations of each parent. These were never completed.
 {¶ 20} Meanwhile, P.L. has blossomed under Bruce and Katherine's care. P.L.'s language skills have greatly improved, and she has made up for early deficits in motor and social skills as well. According to the testimony, Bruce and Katherine's house is safe and child-focused. They have, for over a year, provided a stable, nurturing environment for P.L. The trial court had ample evidence before it from which it could conclude that it was in P.L.'s best interest to be placed in the legal custody of her half-brother and his wife, rather than of her parents.
 {¶ 21} P.L.'s father has specifically argued that the trial court violated his constitutional right to confront witnesses against him by admitting "unreliable and prejudicial testimony" regarding P.L.'s "health, medical, social and cognitive conditions." He has failed to identify specific statements in the record that are deemed affected by this issue, but has referred this Court's attention to a number of transcript pages. Those pages do not reveal any objection based on this alleged error. The father has also failed to preserve this argument in either of his two sets of objections to the Magistrate's Decision as required by Rule 40(D)(3)(b)(iv) of the Ohio Rules of Juvenile Procedure.
 {¶ 22} Even if the father had properly preserved the issue for appeal, the constitutional right to confront witnesses is limited to criminal proceedings. In re *Page 12 Burchfield, 51 Ohio App. 3d 148, 154 (1988). Dispositional hearings in juvenile court are governed by Rule 34 of the Ohio Rules of Juvenile Procedure. Subpart (B)(2) of that rule provides that, "[e]xcept as provided in division (I) of this rule, the court may admit evidence that is material and relevant, including, but not limited to, hearsay, opinion, and documentary evidence." Statements regarding P.L.'s "health, medical, social and cognitive conditions" are certainly "material and relevant" to the question of legal custody and a determination of what is in the child's best interest. See Juv. R. 34(B)(2).
 {¶ 23} P.L.'s father has argued that the trial court incorrectly found that Lorain County Children Services had made reasonable efforts to return P.L. to her parents' home. Section 2151.419(A)(1) of the Ohio Revised Code requires a child welfare agency to prove at a dispositional hearing that it has made "reasonable efforts" to prevent removal or continued removal of the child from the home. "When a trial court is considering whether the agency made reasonable efforts to prevent the removal, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." In re Mastache, 5th Dist. No. 2006CA00250, 2006-Ohio-6937, at ¶ 15. The statute provides that "the child's health and safety shall be paramount" in determining whether the agency made reasonable efforts. R.C. 2151.419(A)(1).
 {¶ 24} The trial court correctly noted that Lorain County Children Services made reasonable efforts to enable P.L. to return to her parents' home. The court *Page 13 
specifically found that the agency provided case planning and case management services and also provided multiple referrals for parenting classes and mental health evaluations for the parents and developmental testing for P.L. The agency researched relative placement and monitored that placement, including progress made on recommendations specific to P.L.'s special needs. The agency social worker made multiple home visits to the parents' Ohio home and later to their house in West Virginia. The trial court correctly found that the agency made reasonable efforts to prevent the continued removal of P.L. from her parents' home. The father's assignment of error is overruled.
 CONCLUSION {¶ 25} P.L.'s father's sole assignment of error is overruled because there was ample evidence from which the trial court could conclude that it was in P.L.'s best interest to be placed in the legal custody of her half-brother and his wife and that the agency had made reasonable efforts to prevent the continued removal of the child from her parents' home. The judgment of the Lorain County Common Pleas Court, Juvenile Division, granting legal custody of P.L. to her half-brother and his wife is affirmed.
Judgment affirmed.
 The Court finds that there were reasonable grounds for this appeal. *Page 14 
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
 SLABY, J. CARR, P. J. CONCUR *Page 1